The honorable judges of the United States Court of Appeals in and for the Southern judicial circuit, hear ye, hear ye, hear ye. All persons standing business before this honorable court are admonished to draw near and give their attention as the court is now sitting. God save the United States and this honorable court. Good afternoon. Welcome everyone. We have a group of students, both law students and undergraduates, here with us this afternoon from a firm in town. We extend a special welcome to you. It's nice to see lawyers back in our courtroom. We're thrilled for that. We have one case up for argument this afternoon, and we'll turn right to it. It's number 21-1649, Life Spine, Inc. v. Aegis Spine. And we'll begin with Mr. Castanhas. Whenever you're ready, Your Honor. Good afternoon, and may it please the court. My name is Greg Castanhas, counsel for Aegis Spine. Aegis appeals from a preliminary injunction order entered in the Northern District of Illinois that broadly prohibits Aegis from, among other things, selling and marketing the Accelfix XT spinal implant. That injunction should be vacated or remanded for at least the following three reasons. First, there was no secret. There was nothing secret or confidential about the allegedly copied Life Spine device, and that's true as a matter of law. It was admittedly sold, you can find this at page 71 of the red brief, to hospitals and surgeons without any confidentiality restrictions. And it's also the subject of a detailed patent disclosure with 123 detailed drawings and 39 columns of written specification. These facts are without dispute. So the district court's likelihood of success holding was the product of legal error. The other two points I intend to leave to the briefs unless the court has questions. But the second one is that that legal error permeated all of the district court's evaluations of the other equitable considerations. So those evaluations, too, should be vacated. And finally, Life Spine's efforts to seek affirmance of this injunction on alternative grounds unrelated to the confidences and trade secrets cannot support the broad and sweeping injunction that the district court entered. Mr. Castanhas, before you get started, you have characterized this throughout your briefs, and I'm hearing you saying it again this afternoon, as a legal error by the court. Wasn't this really a factual determination by the court that the information at issue in the three separate categories that the court found constituted trade secrets that not as a legal issue, because I don't see anything in the magistrate judge's thorough and detailed report that suggests he didn't understand the law. But he made factual determinations that the information at issue wasn't public and specifically fell within the definition of the trade secret. So you seem to be trying to characterize this as a legal issue, and I understand why, because you'd rather have a de novo review than a clearly erroneous. But I don't see how it's a legal issue. So Judge Saini, let me respond to that by saying that because the facts are undisputed with regard to these issues, this resolves to a question of law. Was there a secret? There isn't a factual. But they're not undisputed. Here's what is undisputed. I don't mean to speak over you. Here's what is undisputed. What is disclosed in the patent? Absolutely undisputed. It's plain as the paper that it's printed on. What's also undisputed is that these. And I think, so to follow up on that, you do not dispute that the precise dimensions and components and subcomponents of the medical device at issue are not disclosed in the patent. Is that correct? I have to qualify. My answer is yes, but qualified, and I'm going to explain why it's qualified. Okay, and I know that was a double negative, so I can rephrase it if I need to. The answer is I accept that there are not specific numbers that are called out in the patent. That's absolutely true. Let me take you to CAGE. So you would agree, then, that the patent does not disclose the precise dimensions of the CAGE and of the installer. Is that correct? Not in so many words, and this is where I want to take you to the patent. Forgive me. I think your qualification alone that you're trying to put on this shows that there is a factual dispute there that the court resolved. Well, I think that the court resolved. We don't have to shrink, and I think we said this in both of our briefs. We don't shrink from the clear error standard if you view this as a factual question because if you view it as fact, it is clearly erroneous. And now let me, if I could, take you to the patent. And I realize that I'm on thin ice when I'm not in the federal circuit taking appellate judges to a patent. Oh, but I'm a forward district court judge who did a lot of patent work, so. All right. So, okay. So we'll start with the basic requirements of Section 112. Section 112 says to the patent owner, you can get a patent and you can exclude people for a limited period of time if you disclose your invention to the public. Let's look at what these inventors said. This is page AA111. It's at the bottom of page 33. I'm sorry, column 30. Say the reference again. I'm sorry. I have the wrong page. I have my brief flipped. It's AA112. It's in the first volume. And it's at the bottom of column 35. And this is in the paragraph that begins, it is important to note. It is important to note that the construction and arrangement of the elements of the various implants and implant components, as shown in the exemplary embodiments, are illustrative only. Although a few embodiments have been described in detail, and I'll skip a few words there, those skilled in the art who review this disclosure will readily appreciate that many modifications are possible. E.g., variations in sizes, dimensions, structures, shapes, and proportions of the various elements, values of parameters, mounting arrangements, materials, colors, orientations, etc. without materially departing from the novel teachings and advantages of the subject matter recited in the various embodiments. Accordingly, all such modifications are intended to be included within the scope of the present disclosure as defined in the appended claims. Now, why is that important? First of all, it's the patentee saying, we've given you everything, and the person of ordinary skill reading this knows what the dimensions will be. But we also have record evidence that's also uncontradicted here, and that comes from their own expert, Mr. Ashley. And Mr. Ashley said... I don't think this says, from the patent, that a person of ordinary skill would know exactly what the dimensions are and how the subparts fit together. But go ahead. Right, well, we can disagree on that, and I think you can still agree with my major point, and that is that this patent told the world all the parts, all of the interconnections, and then what's left? The sizes. Well, what do we know about the sizes in this case? We know two things. First of all, we know that Mr. Ashley said that because of the common size of the human spinal gaps, that spinal implants of this size are typically in the area of 11 millimeters wide. And he said, testified affirmatively, that that would be a good start for anybody to be able to figure all of this out. And I'd suggest to you, quite frankly, that with the hundred and some drawings here and all of the detailed descriptions, that once you know that the width is about 11 millimeters, everything else will fall into place. But put that aside also, because what you also have here are other public disclosures, aside from the patent. You have sales. You have sales that, yes, the sales to us were subject to the confidentiality provision, but the further sales to hospitals and to doctors were not. And that makes this case exactly like- But those went through third parties. And weren't there, like, a ton of precautions that were taken? When the device comes into the hospital, it comes into a box, I assume, that is sterile. And it's only opened in the sterile field in the operating room. And then the surgeon implants the device into the person's back. So there's no opportunity for a hospital or a surgeon to use the device to take measurements and those sorts of things. And from what I understand, the representative, the sales rep, is right there in the operating room. Ten feet away from the person that's cut open on the table. And under the agreement, that sales rep has to, it has fiduciary duties with respect to the device. And it has to ensure it's going in and nothing else is being done with it. That's a lot of protection to put in for a medical device. Well, it is the nature of the hospital. But the simple fact of the matter, as I was saying before, this really is indistinguishable from the 11th Circuit's decision in the Robocert case. And that's one where the person who was purchasing the device, that was a vending machine in that case, was subject to a confidentiality agreement. But everybody knew they were going to be disclosing it to further entities, like in that case, further distributors, without any confidentiality restrictions. And that means that this case is exactly like that. But a vending machine doesn't come sterile. Well, sterility is one thing. Disclosure of what it looks like. And quite frankly, Judge Kirsch, if you look at the patent, look at the drawings, look at their internet site, you can see how all of these things fit together. And all you're doing is looking at this and saying, oh, well, gee, this is 11 inches and it's about that high. Everything else falls into place. But as the judge acknowledged, that's a starting place. But that doesn't disclose what Lifespine is arguing is the confidential and trade secret part here, the dimensions, the interconnections. And again, we're looking at the magistrate judge's thorough and detailed findings for being clearly erroneous. And he considered the testimony that this was a good starting point, but found all of the other testimony to support that this is a trade secret. How do you get around that under a clearly erroneous finding? Well, as I said before, Judge Sediv, the clearly erroneous standard is not one that we have to shrink from here. It is a definite and affirmed convention. I understand, but how do you get around that? Well, I'm hoping to explain that to you. It's a definite and affirmed conviction that the judge made a mistake. And I think here, the patent here is the key. Because what you end up with is an expert who said, well, here are the five similarities I see. Upper endplate, lower endplate, anterior ramp, posterior ramp, and screw. All of those things are right there in the patent. Now, this court's decision in the composite marine propellers case, which we've cited in our brief and our friends on the other side have not responded to, say, look, when you're trying to claim a trade secret in the face of a patent, then you've got to filter out. You've got to show concrete, specific secrets that are not in the patent. They didn't do that here. They weren't put to that challenge here. But I come back to the question I asked you earlier in the patent. And I think you conceded the language that you identified in column 35 doesn't go quite as far as you suggested. Where in the patent do you find the precise dimensions of the components and subcomponents and how those interconnect? Because that's the key. They're not claiming everything qualifies as a trade secret. That's the key to the magistrate judge's findings. All right, so first of all, I take you to AA58, and this is also in our blue opening brief at page 7. This is figure 87 from the patent. This shows this is an exploded version of how everything fits together. This shows the precise connections, all of the ways that things fit together. The only thing that you don't have in this drawing, quite frankly, is a specific number that says, okay, you're going to have this. This is going to be how wide it's going to be. But we know already, undisputedly, because it came out of their expert's mouth at the hearing, that 11 millimeters is the standard width to go into a spine. If you were analogizing to copyright, for example, this would be like a sawn affair. This is something that exists before the patent, before the supposed trade secret. You can't get around the fact. You can't make this 20 millimeters wide because it won't fit. And everything else, you could back that completely out of here, which is why these inventors said at the bottom of column 35, look, we're disclosing all of this to you. They gave that disclosure to the world. You're not – I'm sorry, go ahead. Mr. Xanis, where in the record, though, do you get support from? If you take the exploded diagram, as you just did, how do you get to the next step of saying that from the exploded diagram and all the other diagrams in the record, that you can get to the particular precise exacting dimensions of the component parts? Well, I'd start you with Mr. Ashley at page AA536. That's where he says the dimensions of implants have been standard for, you know, three decades or more. It needs to be 11 millimeters wide to fit in the spine. 11 millimeters is a common width for spinal cages. That was also true with regard to the Concord Opti-Cage, which was a prior substantially equivalent predecessor to Lifespine's invention. Right, and I thought from your brief that you might – that Ashley's testimony is what you would turn to. But as I read it, I have it right in front of me. As I read it, he doesn't go beyond recognizing that it's the starting point. So how do you get to the end point? So then you get to the end point. You can also look to the Prolip Surgical Guide. That's at page AA128. There are measurements also listed there specifically. Jack Lee? No, this is actually a document at page AA128. It's actually the beginning of the second volume of the appendix. But that doesn't have the precise measurements in it either. Those are very general dimensions. And the testimony from the Lifespan representative that the magistrate judge relied on specifically said that the specifications of the Prolip are not easily derived from patent materials. And it's interesting, Judge Sineve, that in response to that, our fused device here also isn't the same size anyway. They're really trying to have it both ways. They're saying, well, this doesn't disclose the specific sizes. But then they're saying that our Prolip. But it's close enough that your parts fit together in a way that the evidence was uncontested that no other installer and cage from different manufacturers fit together. Let's talk just a little bit. I'm into my rebuttal time. You're into your rebuttal time. So if I could just respond very quickly to the installer point. The installer point is a little bit of a factual red herring in this case. Because what the installer is, is it's a long tube that has tongs on the end. And then it also has a hexalube screwdriver in the middle. So you first hook it on with tongs. And then you can use the hexalube screwdriver to expand it. It's like a car jack. It's like a modern hydraulic car jack that way. But what the evidence showed here is not that there was a perfect connection. Quite the contrary. With regard to the installer, you can't get a firm attachment. That's Mr. Ashley at page AA527. So it didn't work perfectly. It was quite wobbly by Mr. Ashley's own admission. And that's just a function of the fact that the hexalube screwdriver is a common screwdriver. And the tongs managed to get a loose grip on it. The interesting thing is that the other way didn't work at all. The other installer wouldn't work on the other product. If I could, and I realize I'm using more rebuttal time, I want to leave you with four questions that you might profitably think about when my friend gets up here. Why is it that Lifespine cites no cases holding that a physical device that is marketed and sold can retain its trade secret protections? In other words, why are these cases always fought in the patent realm instead of the trade secret realm? Secondly, why was Lifespine not required by the district court? But wait, you're not arguing that any time something is patented, that the entire device and every aspect of it gives up its trade secrets, are you? No, I'm not. Because that would be counter to Supreme Court law. Absolutely. But it brings us to the second point, which is why wasn't Lifespine required to filter out the patentable elements but instead rely on an expert who used exactly patentable elements to define what he claimed to be the trade secret? That's composite marine propellers. Third, Lifespine's expert, Mr. Ashley, who I've referred to a lot today, why was he not willing to say that our devices were the same as theirs, but only willing to go so far as to say they were substantially equivalent? That's exactly the language of the 510K application process. That's a patent phrase. Well, but it's also, in this case, it's an FDA phrase. And it's exactly what both they admitted with regard to the optic cage, as well as we admitted with regard to their prior device. We're allowed to do that under the FDA. In fact, that's sort of a demonstration of why this is common, that these things are known out there and you fight this in the patent area. And then finally, why is Lifespine so careful to couch its arguments in the nature of Lifespine considers these to be secrets as opposed to they are objectively secrets? I'll return on rebuttal with my last minute and a half. Thank you so much. You're welcome. We'll hear from counsel for ages now. I'm sorry, Lifespine. Yeah. Sorry. May it please the court. My name is John Bungia. I'm one of the lawyers representing Lifespine in this case. We're here because the appellants, ages, are challenging a preliminary injunction that was issued by the district court in this case after nine days of trial, 16 witnesses, 191 exhibits, and hundreds of pages of briefing and factual submission in the trial court. The judge's decision below was not an abuse of discretion, and for that reason we ask that you affirm Judge Kim's injunction. What I'd like to do, unless you'd like me to proceed otherwise, is to first address some of the arguments that have been made by my adversary. Mr. Bungia, before you go too far down that road, do you agree my review of this and the arguments presented seem as if this is a challenge to the factual determinations of Magistrate Judge Kim as opposed to legal challenges? Do I agree with that? Is that a fair characterization from your standpoint? It's not only fair, it's entirely accurate, 100% accurate. For example, if we talk about the patent issue, my adversary says, well, this is a question of law. It's not a question of law at all. The issue is whether or not the patent, according to ages, discloses the trade secret at issue here, which the judge below characterized specifically, and we characterize and argue and our experts characterize, our lay witnesses characterize as precise dimensions of prolif's components. That's in the SA50 in the judge's decision. And Lifespine says, well, look, the patent discloses the precise specifications and dimensions. That's a factual question. It's not clearly erroneous, and how do you know that? Well, look at their own patent drawing, page 7, 8 of their brief. It doesn't have the millimeter fractional measurement for the dovetail that is the key expansion mechanism. This is a very small device, as you know from the record, that must be capable of expanding to separate the vertebrae, but also, once it's expanded, stay in place for the lifetime of the patient. That's the goal. So it needs to be extremely specific and precise. The dimensions here are fractions of millimeters we're talking about. What's the pairs? What you're pointing out, Mr. Bungie, and Mr. Castanis may want to respond to this, I think is a real difference in approach between the two sides. You want to approach this, and I totally understand why, at a high level of specificity, at that kind of nanomillimeter level, and you want to ask the trade secret question at that level, which is what Magistrate Judge Kim did. Your adversary wants to elevate the generality of it and point to the kind of picture of the explosion and say the it there for purposes of defining the trade secret as more the device kind of writ large. I don't know that the ship's passing the night, but that's where you part ways with one another. Right. I think you're exactly right, Your Honor. In response to that, let me say this. First of all, Agis itself at page 26 of their brief, they concede in its settled law that specifications that aren't present in the patent can be a trade secret. That's not in dispute here. The judge said the specifications are the trade secret in addition to pricing information and testing information. The reason, it's not that we're talking about something that's not important. It's something that's very small and not disclosed in the patents. For example, the dovetail, as you see the dovetail on their device, the knockoff, as Judge Kim found, in our device is precisely the same, down to a fraction of a millimeter in terms of the radii and so on. Those are very important dimensions and designs because those are the designs that allow this small device to mesh together and work within a spine. Can I move you beyond that point? Yes. The briefing is excellent on both sides. I totally get your position. Can I ask you, Life Spine's witness, Mr. Knapp, testified that end users, so surgeons, hospitals, institutions, et cetera, they don't sign confidentiality agreements covering the device. The confidentiality is more at the distributor level. Does that mean that an end user, say a research university, a research hospital that's focused on orthopedic spinal surgery, could take a device, study it, capture its dimensions, put it under the microscope, et cetera, freely? No, it doesn't, Your Honor. I'd refer you to the record at SA51, for example, District Court's opinion. The reason I say that is because this is the evidence from Mr. Butler, from various other witnesses from Life Spine, and the judge repeats these facts below. The facts are that what Life Spine does is, yes, it sells to hospitals, but what that means in this context is a distributor, and all these distributors have the same agreements or similar agreements as the one Aegis does, where they have a fiduciary duty, Section 3A, to be a trustee of this piece of property, to take care of it for Life Spine's benefit. Those distributors, the way this works is they go into that operating room, they take the package in there, which, as Your Honor said, is sterilized in a sterile packet. They are required, as the District Court said and the witnesses said, these distributors, these fiduciaries, to stay there in the operating room during the surgery, make sure that this product is put into the room. So what you're saying is in the context and setting, no, it's not going to happen that way, and if the U of C or somebody wants one for study purposes, they can reach out, but they're going to be asked to sign a confidentiality agreement. That's exactly right. And there wasn't any evidence in the record, at least that I saw, was there any evidence suggesting that any end users had taken this device for any other purposes other than the surgical purpose? No, not at all. There's no evidence that any ñ I mean, this is my client's flagship product, and there's no evidence that anyone ever, any place in the world, has any of these specifications other than Aegis and L&K, their parent. Because what would have to happen is, theoretically, you could implant the product, it fuses with somebody's spine, and I suppose they could go back in two months and submit themselves to another surgery to take it out of their spine. But the law says reasonable precautions under the circumstances. And certainly, life-spine is taken. Patients don't sign confidentiality agreements, do they? No, they do not. Not to my knowledge. No, they do not. It's going to be a little weird. They do not. It would be a little weird. I agree fully, and we make that point in the brief, that we're supposed to get a person going in for back surgery to sign an NDA before they have a product put in place. And the reason why we don't have to do that is because we have these fiduciaries, the distributors, in the operating room watching the surgery, making sure that our flagship product gets implanted in somebody's spine, where it is fused with the patient's spine. Mr. Bund? Go ahead. Just one quick follow-up on that. Is the device sent directly to the hospital, or is it sent to the distributor that then takes it to the hospital at the time of surgery? Judge, I'm not 100% sure. I believe it goes with the distributor who takes it to the surgery, but I don't know if they sometimes send it on ahead. What I do know is that, regardless, it's in a sterile package, and the sterile package is not open until the surgery is taking place, where the distributor, the fiduciary, is standing. The other point I'll make. These are also sold in an individual case-by-case basis, right? These aren't guide wires or balloons or something like that, where the hospital has them on hand to use in the event that it's necessary, even though those also come in sterile packages. Well, that's exactly right. This is a very specialized product. It's an expensive procedure and so on. The hospitals don't want to keep this inventory on hand. We keep the inventory. Our fiduciaries bring it to the surgery, make sure it goes into the spine, because we want to protect our trade secrets. By the way, a common theme you'll see in our brief, and I won't go through all the sites right now unless you'd like me to, but Aegis itself, their own witnesses testified that they regard their knockoff product as containing trade secrets and need to be protected, and that no one could create something like this without specifications. I mean, they say these things over and over again. Another point I'll make here, and I think this is important on this whole idea that the patent was somehow a recipe to make this highly sophisticated engineering product or that anybody can get their hands on it. Well, look at what the facts are in this case. The facts are not that Lifespine and Aegis, and this is in the district court's opinion, decided in the spring of 2016 in their own words, we desperately need an expandable cage to compete in this market. The facts are that they then looked up the patent and said, okay, well, let's do it. I'll get it done by the end of the week. They couldn't do it. They tried for years. By their own testimony, as of December 18, 2018, two and a half years later, they absolutely failed in producing the product, and they started over. That Sang Soo Lee's testimony, the judge found their lead engineer not credible, but on that testimony he certainly was because it's borne out by their own records that they gave up and they started over. So if the patents are this recipe, why can't you make it until you get our product surreptitiously and start testing it and figuring out how it works and then just copy our dovetail in the spring of 2019? And while there are no records indicating how you went about creating this device and so on, it's obvious what happened here. Can I ask you a question about the 45 devices that were ballparked that were sold after that agreement and the DBA expired? Is that significant or insignificant in your view? They were sold without the protections of that confidentiality agreement, at least formally, in place, right? It had expired. The sales in December? Yes, yes. It's an interesting fact. I don't think it's significant in terms of resolution of the case in front of you, Your Honor, Judge Scudder. And the reason I say that, a number of reasons. First of all, yes, the distribution and billing agreement had expired by its Now, we were still working and there's lots of testimony that the parties understood that the terms of the contract were still in place and they were exchanging drafts. But regardless of that, Section 15 of the distribution and billing agreement is a survivability clause that applies to the confidentiality provision, the fiduciary duty provision. Yeah, see, I see that as a – I think you're definitely right. It applies to the May-June 18 sales when the agreement's in place. But I'm not so sure that it applies to the December 2018 sales because the agreement had expired. So you can't apply a survival clause from an agreement that is not even in place. Well, a few responses. First of all, we briefed this below and in front of this Court. I believe that the survivability clause by its terms means that some of these that occurred while the agreement was in effect. And that's not uncommon. That's common in industries like this, I believe. Another point is the whole trade secret argument isn't even one based in the contract. So it's just an argument that they took our trade secrets and that's a violation of law. But not if they have the device, not if they could go buy the device on the open market and compare the device with the patent. And then, I mean, like the testing data is an issue here. We don't know where they came up with the testing data, right? Your inference is that they took the device, they performed their testing data using your device, and then they presented it to the FDA, I think at least. But if they had bought a device that they could do anything they wanted with it, if they bought 45 of them, they could pull them apart, they could measure them, they could study them, they could perform testing data on them, they could do anything they wanted to. And then they have the patent information. At that point, there is no trade secret, right? Well, I understand your point, and I accept it. It's a good point. Obviously, the fiduciary obligation extends beyond the expiration of the contract, in our view, and I believe according to the law, based on Section 15. Go ahead. The other point I want to make about this whole idea of the consignment sales is, first of all, the contract, the argument that AGIS actually made wasn't so much based on the expiration, but they said somehow these restrictions that are contained in the distribution agreement don't apply to distribution agreements. The agreement, as Judge Kim said, and he addressed this issue at some length, doesn't say that at all. It creates a distribution agreement. But the other point I want to make is, again, this whole issue is a fiction created for purposes of this litigation. And why do I say that, or this appeal? I say that because there is nowhere in the record where you're going to see AGIS saying that what happened here is we got these 45 implants in December 2018 and we took one of those and reverse engineered it. That's not their defense. That's not what they said. They never said that at all. They said we never reverse engineered anything. We didn't take the product he sent to Korea out of the box. Yeah, I thought one of the points in the brief you were making, too, is that the time is different, that you'd say forget December of 18 because the theft started in May, June, in your view. That's exactly right. And as Judge Hirsch was saying, the district court found that. The district court found. There was a finding here that there was reverse engineering, and that's obvious for many, many reasons. One being, we don't send them the product. AGIS sends the product to Korea, deceiving us, life-spying. And then when it gets there, no one can explain what happened to it. They say, oh, we never opened it. We sent it back. The judge found he made a specific finding that that testimony was quote-unquote not credible. He looked at that witness. He saw the cross-examination. The witness could not explain what happened to the product. They have no shipping records. It doesn't make any sense. And beyond that, they have this October 2018 PowerPoint presentation in which they present AGIS and L&K to each other, testing data on our product. And no one has. And that was before they ever got the 45 additional. That's exactly right. That's two months before. And they also had the e-mail that went with information on the installer that the district court made the finding on. I think that was in May of 2018. Yeah, that was in the summer of 2018 as well. And there are all sorts of things they had. They had an individual who actually worked for L&K posing as an AGIS employee to life-spying and sending information. They got the installer sent to them. There's an e-mail from the summer, as Judge St. Eve said, that says we're going to copy the installer from Lifespine and use it for ours. There's the testing data itself. The witnesses conceded because they had to. The L&K was – I mean, sorry, AGIS was telling L&K specific information about the design, how the design should work in creating this product. For lack of a better word, lying to Lifespine about it. That's what the judge found. Can you spend a couple minutes on irreparable harm? Yes. The reason I'm asking you that question, I realize there may be some difficult calculations that you'd have to go through to monetize all of this, but it seems that you could do that. And maybe start with, before we get into that, it looks like the court applied the wrong standard, applied a presumption in trade secrets, which our law no longer applies that presumption. Well, sure. I'm just dovetailing on Judge Scudder's question. All right. So on both of those questions, first of all, the judge did say that a presumption applies, and I do believe that it's not clear under the law necessarily that the presumption is gone. We've pretty clearly said in Flava that there's no presumption anymore. Okay. Well, Aegis did not argue below that there was no presumption. And as a citation for that, I'd refer the court to Essay 61. So in our view, they waived that argument. But secondly, and more importantly, in his opinion, he does say there's a presumption for a trade secret, but also there's a presumption on the confidentiality provision of the case. And he also makes factual findings about irreparable harm. He says specifically, the judge, that there was a quote-unquote strong showing of irreparable harm on behalf of life spine. That's at Essay 63. Essay 63, a strong showing of irreparable harm from life spine. He cites our evidence about loss of customers and loss of market share, which the case law makes clear is an appropriate type of irreparable harm in the context of an injunction because it's hard to figure out what happens to your market when something like this happens. And beyond that, he did not only say there was a strong showing of irreparable harm on life spine's part, Essay 63, he said the evidence on Aegis' side was quote-unquote relatively weak with respect to the evidence of harm. Essay 67. I guess what I'm trying to get at is you say there's market losses, there's customer losses, there's goodwill losses. Well, just monetize them. Why is an injunction necessary? Well, because I believe under the case is the market share can disappear. What they talk about in the case is it's difficult to figure out really how to trace what business you don't get because your products and your market has been undermined. And that's why the loss of customers, loss of market share, and so on. That's what I have a hard time. If you go back to what you said a few minutes ago, Mr. Bunn, it really resonates with me in a sense. It's a flagship product. Your client's watching this like a hawk. Somebody swoops in and steals, copycats the product. You're all over this from a financial perspective. You're off litigating all this. It just surprises me that you – and I'm not saying it's not going to – it's simple or something. You get a back of an envelope out. I'm not saying that. But it's hard for me to believe that you can't monetize the harm. Well, Your Honor, all I can do is say that as a district court found, this type of irreparable harm has been accepted in the cases,  partly because it's difficult to figure out what might have happened if our product hadn't been knocked off. Didn't the court also rely on loss of reputation? Yes. Which I think is harder under the law to monetize. Yes, that's exactly right. And loss of reputation in a specific context, which is that we have a reputation, as the witnesses said and the judge found, for producing niche products, specialized products. It's very important when you're trying to sell them to hospitals. And I won't go through the proof unless you want me to. But the way you sell products when you're a small company like this to a hospital is to demonstrate you're creating niche products that are unique in some way. Thank you very much for your time, Your Honors. Thank you. Mr. Costanez, we'll give you a few minutes. We took a few extra minutes with Mr. Bungie there. Thank you, Your Honor. I'll try to be very brief. I have four points. First, it was interesting to hear from my friend that the dovetail is the key. Our dovetail wasn't identical. What did we misappropriate? Pages AA 511 to 512. The only claim that was made here was substantial equivalence. Second point. This wasn't kept secret. This device was displayed at trade shows. That's at pages AA 492 to 498. They said that people were watching, but, of course, they let people handle it, and so on. But handling something or seeing something at a trade show is not going to give you the nanomillimeter measurement. I think that's the response you're going to get from the other side, that, yeah, I can have it in my hand, but that's not going to tell me. You get the point. I do get the point, but I'm going to go and tell you other reasons why it's not secret as well. They even had cadaver labs where they were showing it implanted in the spine. That's at page AA 443. And to the colloquy that I had with Judge Suneev earlier, if they didn't disclose all of this important stuff in the patent, then the fact that they claimed that they disclosed everything violated the best mode requirement, the enabled requirement, and the written description requirement of Section 112. And, Judge Scudder, you asked the question. Maybe that's a different lawsuit, but that doesn't… Well, that may be a different lawsuit, and that's, in fact, what we'd say is that if there's going to be a lawsuit in this, then bring your patent at us and tell us why this thing that you disclosed to the public is something that we're infringing. I don't think they want to do that because I don't think they want to put this patent to the test of validity for the reasons that I just said. But, Judge Scudder, you asked a very important question. What about those 45 devices? They were sold free and clear. The magistrate judge in this case made that finding. That's at page SA 23. Right. So I do think that December date is significant, but what I think you have to account for is what happened before December. Like Judge Suneev was pointing, there's meaningful activity between Aegis and L&K before December. Right. And activity that the court specifically relied on, which is… That's absolutely the case. But if you look at the court's findings, the court really thought it was odd that it was after December, which is, by the way, when those 45 devices were sold free and clear without restriction to Aegis. It was after that that Aegis was able to solve the 510K issue, get its application on file with the FDA. The free and clear part is tricky, though, isn't it, as a factual matter? Because, I mean, I know it's free and clear. It expired. It's not the expiration that we rely on. It's the fact that it's not a consignment sale. That DBA that's in the record is all about consignments. We didn't have to pay a thing when we took delivery of a product. We didn't have to pay until we sold it. What limits the confidentiality section of the DBA? I understand there's some limit in the fiduciary duty section, but what limits the confidentiality section in the DBA to consignment? The entire agreement is about consignments. That's what limits it. The confidentiality agreement doesn't mean that if we took a sale and received a fee simple absolute equivalent of these implants. That means they're ours. We can do with them what we want. They were not sold pursuant to the contract. It's pretty clear from the magistrate judge's finding that they weren't. And so all of the nefarious things. But the broad language of the confidentiality provision doesn't limit the confidentiality to just the consigned inventory. You might have an argument in Section 3A, which limits the fiduciary duty arguably to the inventory, which is defined in Section F as consignment inventory. But that same inventory limitation isn't in Section 7 that talks about the confidential information and responsibilities with respect to the confidential information. That's defined much more broadly. It is defined differently. And more broadly. And indeed I can admit that it's more broadly without having to lose my point on this, which is the simple fact is that that confidentiality restriction is part of the contract as a whole. The contract as a whole speaks to a distribution arrangement. And the distribution arrangement was not full. Thank you very much. In fact, my colleague points out that if you look to Section 1H of the agreement at page AA6, the definition of sale in this agreement is a customer's purchase of a product coupled with distributor's issuance of an invoice to the customer. It's not our purchase. That's what this agreement is about. I still don't think that impacts the broad definition of confidential information under 7A. But you're essentially out of time. So go ahead. I don't want to sidetrack. Well, I am. And I'd just like to point out that one further point with regard to that sales provision is that, or the December sales, is Judge Scudder. They wouldn't take them back. Say that. Say it again. They didn't take them back. We asked to send them back and get our money back. They said, no, we won't take them back. They're yours. You keep them. Well, okay. Then we have to be able to do the things that we can do with that. Okay. Why don't you go ahead and conclude? My two last points. Judge Kirsch asked about testing data. Even the evidence on that is not very strong. It's certainly not the level of strength that would support the finding that was made here. But in any event, even if the finding were made, it wouldn't support the sweeping injunction in this case. And then finally, to your question, Judge Scudder, and your question, Judge Sonniv, about irreparable harm. Absolutely right. This is a breach of contract case. Damages are the traditional remedy for breach of contract. The contract itself even monetized harms for lost instruments or instruments that they didn't get back. They expected this to happen. It can be monetized. Thank you for your indulgence. It's nice to see judges in person again. Thanks very much. Thanks to both sides for the quality of your argument today, for the quality of your briefing. We appreciate it very much, and we'll take the case under advisement. Thank you.